UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MICHAEL McMILLAN,

    Plaintiff,

v.

ROBERT POTTER and UNITED FOOD &
COMMERCIAL WORKERS, LOCAL 951,

    Defendants.

_____/

Case No. 1:04-CV-836

Hon. Richard Alan Enslen

**OPINION**

    This matter is before the Court on Defendants Robert Potter and United Food and Commercial Workers, Local 951's ("Union") Motion for Summary Judgment under Federal Rule of Civil Procedure 56(c). The Motion has been fully briefed and the Court discerns no reason to hear oral argument. W.D. MICH. LCIVR 7.2(d). For the reasons set forth below, the Court will grant in part and deny in part Defendants' Motion.

**I.    BACKGROUND**

    In 1980, the Union's general membership elected Defendant Potter to serve as its President and chose Plaintiff Michael McMillan as its Recorder. By virtue of their elected office, Plaintiff and Defendant Potter held a seat on the Union's executive board.[1] Pursuant to the Union's constitution, the Union President operates as its chief executive officer and is authorized—except when a decision calls for a full executive board vote—to manage the Union's affairs. The Union Recorder is required to create a permanent record of the Union's quarterly executive board meetings. Plaintiff was a full

---

[1] The remaining elected officials on the executive board include the Secretary-Treasurer and at least three Vice-Presidents.

time employee of the Union, but his duties as Recorder did not require his complete attention. Therefore, Defendant Potter directed Plaintiff to perform many tasks beyond his Recorder duties.

In 2000, the United States Department of Labor began an investigation into the Union's finances and a grand jury was convened to consider whether any criminal wrongdoing may have occurred. Plaintiff cooperated with the investigation and testified before the grand jury. Plaintiff states that he identified documents and budgetary items before the grand jury that reflect a $25,000 moving allowance was disbursed from the Union to Defendant Potter. In addition, Plaintiff met independently with investigators from the Department of Labor.

Also in 2000, the Union established a legal defense fund to reimburse its officers for legal expenses that could be not be paid out of Union funds. Defendant Potter asked Plaintiff to contribute $10,000 to the fund. A Union Vice-President later asked Plaintiff to commit $5,000 to the fund instead. Plaintiff refused both requests and made no contribution to the legal defense fund.

According to Plaintiff, around this time Defendant Potter directed other Union members and executives to limit their contact with Plaintiff and sought to exclude him from executive meetings. Plaintiff states that he and the Union Secretary-Treasurer attempted to attend an executive meeting on August 28, 2002, but Defendant Potter ordered them to leave.[2] Plaintiff also states that Defendant Potter altered the minutes of the July 9 and 10, 2002 executive board meetings and later told other

---

[2] Defendants dispute that this meeting was considered an executive board meeting because it was not one of the regularly scheduled quarterly meetings. Defendants also invite the Court to disregard certain portions of Plaintiff's Response in light of Plaintiff's failure to properly support his factual assertions by citation to the record. Although the Court certainly prefers precise citation to evidentiary materials and is disinclined to independently wade through the record and assure that statements pled comport with supporting evidence, in this case the Court finds that it can adequately identify the facts and evidence upon which Plaintiff relies. *See InterRoyal Corp. v. Sponseller*, 889 F.2d 108, 111 (6th Cir. 1989).

executive board members at the November 14, 2002 executive board meeting that Plaintiff prepared the previous meeting minutes incorrectly to make it appear as though Defendant Potter was obstructing justice.[3] Plaintiff did not attend the November 14 meeting because he was assigned by Defendant Potter to work in Chicago, Illinois on that date.

Plaintiff later met with a representative from the Union's international parent labor organization (the United Food and Commercial Workers International, hereinafter "International"). Plaintiff reported to the International what he perceived to be irregular financial behavior on behalf of the (local) Union, his willingness to cooperate in an investigation by the International, and request for protection from anticipated reprisals. Plaintiff reiterated his beliefs to the International's President in subsequent correspondence.

In September 2003, the Department of Labor completed its investigation and audit of the Union's finances, finding several violations of the Labor-Management Reporting and Disclosure Act of 1959 ("LMRDA"). 29 U.S.C. §§ 401-531. The Department was particularly troubled by numerous unaccounted for payments by the Union to Defendant Potter (and one payment to Plaintiff and the Secretary-Treasurer). The Department directed the Union to amend its annual financial reports from 1998 through 2000 and properly account for these payments.

Shortly after the Department of Labor completed its investigation, Plaintiff was told he was being sent to Wilson, North Carolina, to assist the International's efforts to organize employees at a local Wal-Mart store. Plaintiff protested to the International's President, maintaining that Defendant Potter sent him to North Carolina in retaliation for his cooperation with the Department

---

[3] For the same reason, Defendants also dispute that this meeting was executive in nature. *See supra* note 2.

of Labor and his efforts to bring the Union's financial improprieties to light.[4] According to Plaintiff, while on assignment in North Carolina, his office within the Union's headquarters was reassigned, his cellular phone was confiscated, he was prevented use of the Union's voice mail system, and his Union vehicle was significantly downgraded.

Plaintiff continued his assignment in North Carolina until March 2004. Plaintiff then informed Defendant Potter that because of his father's illness, he would no longer be able to work in North Carolina and intended to resume his duties at the Union's headquarters in Grand Rapids, Michigan. A flurry of correspondence ensued. Defendant Potter advised Plaintiff that he considered the reasons Plaintiff offered supporting his request for an assignment change insufficient and ordered Plaintiff to return to North Carolina. In Plaintiff's response to Defendant Potter, Plaintiff repeated his belief that he was sent to North Carolina in retaliation and the assignment was an effort to provoke his resignation. Defendant Potter replied to Plaintiff and considered his employment voluntarily terminated. Plaintiff again responded to Defendant Potter, refuting that he voluntarily resigned and reiterating his belief that he had been retaliated against.

Plaintiff then brought this lawsuit under the LMRDA and Michigan common law, charging Defendants with six counts of liability. In support of his Complaint, Plaintiff alleged that: (1) Defendants violated his freedom of speech to comment on Union affairs, as guaranteed by the LMRDA; (2) Defendants unlawfully disciplined him for failing to make special assessment payments under the LMRDA; (3) Defendants improperly removed him from his Union office without due process; (4) Defendants violated Michigan public policy by terminating him; (5)

---

[4] Plaintiff spent roughly three to four days per week in North Carolina, returning on the weekends at the Union's expense.

-4-

Defendants tortiously interfered with his business relations (*i.e.*, his Union office); and (6) Defendants wrongfully terminated him contrary to the Union's just cause policy.

## II.    LEGAL STANDARDS

Deciding a motion for summary judgment requires the Court to determine if there is no genuine issue as to any material fact such that the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c). The Court must consider the record as a whole by reviewing all pleadings, depositions, affidavits and admissions on file. *Matsuhita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The facts are to be considered in a light most favorable to the non-moving party, and ". . . all justifiable inferences are to be drawn in his favor." *Schaffer v. A.O. Smith Harvestore Prod.*, 74 F.3d 722, 727 (6th Cir. 1996) (quoting *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 255 (1986)) (other citations omitted).

Once the movant satisfies his burden of demonstrating an absence of a genuine issue of material fact, the non-moving party must come forward with specific facts showing that there is a genuine issue for trial. *Kramer v. Bachan Aerospace Corp.*, 912 F.2d 151, 153-54 (6th Cir. 1990). The non-moving party may not rest on its pleadings but must present "specific facts showing that there is a genuine issue for trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986) (quoting FED. R. CIV. P. 56(e)). It is the function of the Court to decide "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-52. The question is "whether a fair-minded jury could return a verdict for the [non-moving party] on the evidence presented." *Id.* at 252. "The 'mere possibility' of a factual dispute is not enough,'" *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 582 (6th Cir. 1992) (quoting *Gregg v. Allen-Bradley Co.*, 801 F.2d 859, 863 (6th Cir. 1986)), neither is the

submission of *de minimis* evidence. *Hartsel v. Keys*, 87 F.3d 795, 799 (6th Cir. 1996). It is with these principles in mind that the Court turns to Defendants' Motion.

## III. DISCUSSION

Defendants have moved for summary judgment on all six counts Plaintiff alleged in his Complaint. In Response, Plaintiff concedes that summary judgment is proper on his LMRDA assessment claim (Count II) and wrongful termination claim (Count VI). The Court will dismiss those Counts without further discussion. As for Plaintiff's remaining claims, the Court finds the following.

### A. Exhaustion

The LMRDA permits labor organizations to require reasonable internal exhaustion requirements as a prerequisite to suit by union members in any court. 29 U.S.C. § 411(a)(4). Ordinarily, a union member's failure to pursue internal union dispute resolution measures prior to filing suit in federal court is fatal to his claim. *Holmes v. Donovan*, 984 F.2d 732, 738 (6th Cir. 1993). Exhaustion, however, is not required "when internal union remedies are inadequate or illusory, or when the union has taken a consistent position in opposition to that of a plaintiff, and exhaustion would therefore be futile . . . ." *Verville v. Int'l Ass'n of Machinists & Aerospace Workers*, 520 F.2d 615, 620 (6th Cir. 1975) (citations omitted).

Defendants contend that Plaintiff failed to properly exhaust his internal Union remedies prior to filing suit. For this, Defendants cite to the Union's constitution article 10(E)(1), which provides that the International President has the authority to resolve disputes between Union members and, if grievants are unhappy with that decision, they may appeal to the International's executive board. Even if this provision could be read as an internal dispute resolution scheme, Plaintiff availed

himself to that process by repeatedly soliciting the International's assistance.[5] On August 8, 2003, Plaintiff wrote the International Secretary-Treasurer and advised him of the problems at the Union and requested protection.[6] On September 24, 2003, Plaintiff wrote the International President and indicated his concerns over the Union's financial affairs and that Defendant Potter had retaliated against him for his interest.  On March 12, 2004, Plaintiff again wrote the (newly elected) International President and reiterated the same.  There is no evidence that the International President ever sought to intervene in this matter.  Therefore, because Plaintiff's repeated requests to the International President to intervene went unanswered, the Court believes he has done all that is required to exhaust those claims.  As for any claims that were not submitted to the International President, Plaintiff rightly considered further attempts to internally resolve this dispute futile.  The International President gave no indication that he was willing to self-regulate the conflict, and the principles supporting exhaustion are a poor fit in this case.

**B.    The LMRDA and Freedom of Speech**

"The [LMRDA] was the product of congressional concern with widespread abuses of power by union leadership." *Finnegan v. Leu*, 456 U.S. 431, 435 (1982).  The LMRDA's primary aim was

---

[5] It is certainly arguable that article 10(E)(2) is not an internal dispute resolution system and instead, merely a grant of authority to the International President, bereft of any of the real machinery of dispute resolution.  For instance, there is no mention in that article of the manner in which claims are to be submitted, whether a hearing will be held, whether the assistance of counsel is allowed, or whether a grievant may rely on other witnesses and/or produce evidence on his own behalf.  However, because the Court is convinced Plaintiff availed himself to this process, it can leave that question for another day.

[6] The Court sees little significance in the fact that Plaintiff addressed this letter to the International's Secretary-Treasurer instead of its President.  Both officials maintained an office at the same address and this letter easily could have (and should have) been passed along to the President.

to ensure that labor organizations were governed democratically and were responsive to the will of their rank-and-file members. *Id.* (citations omitted). To that end, the LMRDA affords union members various protections styled after the federal Constitution, which are listed in Title I of the Act, 29 U.S.C. §§ 411-15, and carry the caption "Bill of Rights of Members of Labor Organizations." *Id.*

> Within the LMRDA Bill of Rights is the right of every member of a labor organization to:
>
> [M]eet and assemble freely with other members; and to express any views, arguments, or opinions; and to express at meetings of the labor organization his views, upon candidates in an election of the labor organization or upon any business properly before the meeting, subject to the organization's established and reasonable rules pertaining to the conduct of meetings: *Provided*, That nothing herein shall be construed to impair the right of a labor organization to adopt and enforce reasonable rules as to the responsibility of every member toward the organization as an institution and to his refraining from conduct that would interfere with its performance of its legal or contractual obligations.

29 U.S.C. § 411(a)(2) (emphasis in original). Furthermore, a labor organization cannot fine, suspend, expel, or otherwise discipline any of its members "unless such member has been (A) served with written specific charges; (B) given a reasonable time to prepare his defense; [and] (C) afforded a full and fair hearing." *Id.* § 411(a)(5). Plaintiff contends that he was otherwise disciplined by Defendants for exercising his free speech rights in contravention of sections 411(a)(2) and (a)(5).

To establish a *prima facie* case under section 411, Plaintiff must prove that: (1) he engaged in free speech as defined and protected by the LMRDA; (2) the Union took adverse action against or otherwise disciplined him; and (3) he suffered an injury as a proximate result of the Union's adverse action. *Black v. Ryder/P.I.E. Nationwide Inc.*, 970 F.2d 1461, 1469 (6th Cir. 1992); *Williams v. United Steel Workers of Am. AFL-CIO/CLC*, 234 F. Supp. 2d 542, 549 (M.D. N.C.

2002). Defendants have advanced several arguments assailing Plaintiff's *prima facie* case; however, the Court finds only one compelling.

Defendants maintain that the Union (as an entity) did not discipline Plaintiff and it took no adverse action against him. Rather, any adversity Plaintiff suffered was solely at the hands of Defendant Potter. For this, Defendants rely chiefly on the Supreme Court's decision in *Breininger v. Sheet Metal Workers Int'l Ass'n Local Union No. 6*, 493 U.S. 67 (1989). In that case, the Court reviewed Breininger's claim he was retaliated against by his union business manager and business agent by refusing to refer him employment because he supported their political rival. In rejecting Breininger's claim that he had been disciplined by his union, the Court began by observing that "Congress did not intend to include all acts that deterred the exercise of rights protected under the LMRDA, but rather meant instead to denote only punishment authorized by the union as a collective entity to enforce its rules." *Id.* at 91. Union discipline "refers only to actions 'undertaken under color of the union's right to control the member's conduct in order to protect the interests of the union or its membership.'" *Id.* (citations omitted). The Court found persuasive the fact that Congress enumerated certain types of punishment (fine, expulsion and suspension), which require "some sort of established disciplinary process rather than *ad hoc* retaliation by individual union officers." *Id.* at 91-92. The Court further clarified that it did:

> [N]ot imply that "discipline" may be defined solely by the type of punishment involved, or that a union might be able to circumvent §§ 101(a)(5) and 609 by developing novel forms of penalties different from fines, suspensions, or expulsions. . . . [W]e do not hold that discipline can result only from "formal" proceedings, as opposed to "informal" or "summary" ones. We note only that Congress' reference to punishments typically imposed by the union as an entity through established procedures indicates that Congress meant "discipline" to signify penalties applied by the union in its official capacity rather than *ad hoc* retaliation by individual union officers.

*Id.* at 92 n.15. The Court ultimately held that Breininger "was the victim of the personal vendettas of two union officers. The opprobrium of the union *as an entity*, however, was not visited upon petitioner" and accordingly no LMRDA claim can follow. *Id.* at 94 (emphasis in original).

The Sixth Circuit further shaped the contours of union discipline in *United Food & Commercial Workers v. United Food & Commercial Workers Int'l Union*, 301 F.3d 468 (6th Cir. 2002). In that case, the Court of Appeals found that the international union president's decision to assign a new store to another local union—instead of the plaintiff local union—did not amount to discipline under the LMRDA. The plaintiff local union alleged that the international union president retaliated against it for its aggressive posture during recent negotiations with an employer. *Id.* at 473. In applying *Breininger*, the court recognized that although the Supreme Court did not intend to limit its definition of punishment to the enumerated penalties listed in section 411(a)(5) and that novel forms of punishment are indeed covered by the LMRDA, the international union president's decision more closely resembled "*ad hoc* retaliation than . . . 'punishment authorized by the union as a collective entity to enforce its rules.'" *Id.* The court also found compelling the fact that the international union president did not undertake any formal disciplinary action and did not fine, suspend, or expel any local union member. *Id.*

More recently in *Webster v. United Auto Workers, Local 51*, 394 F.3d 436 (6th Cir. 2005), the Court of Appeals reviewed an elected union officer's claim that he was disciplined by his union for voicing opposition to ratification of a proposed collective bargaining agreement. Webster alleged that other union officers, who were in favor of the agreement, mounted a pamphleteer campaign to disparage him in retaliation for his views. The court found that Webster "was the target of the kind

of *ad hoc* retaliation by individual union officials that is not subject to the protections of the Act." *Id.* at 441.

In this case, the holdings of *Breininger*, *United Food & Commercial Workers*, and *Webster* are materially indistinguishable. The reprisal Plaintiff suffered was solely at the behest of Defendant Potter, not the Union, and is the kind of *ad hoc* retaliation by an individual officer that goes uncovered by the Act. *Breininger*, 493 U.S. at 92 n.15; *Webster*, 394 F.3d at 441. Defendant Potter's retaliation against Plaintiff had nothing to do with enforcing Union rules, *Breininger*, 493 U.S. at 91, and it was designed to frustrate Plaintiff's efforts to uncover Defendant Potter's alleged financial impropriety. By retaliating against Plaintiff, Defendant Potter sought only to protect himself and did not act to protect the interests of the union or its membership. *Id.* Furthermore, Plaintiff was not subject to any formal disciplinary action. *Id.* at 91-92.

Plaintiff makes much of the fact that Defendant Potter acted in his official capacity and—under the authority of his office—sought to silence his speech. Therefore, Plaintiff attributes Defendant Potter's conduct and the Union to be one and the same. Even granting Plaintiff that logical leap, in *United Food & Commercial Workers*, the Sixth Circuit reviewed the international union president's behavior and found it to be unprotected, individual *ad hoc* retaliation. 301 F.3d at 473. The court, presumably, was unconcerned with the international union president's authority to act on behalf of the union. Furthermore, other circuit courts of appeals have found such representative authority arguments insufficient to allege collective action by the Union. *See Bullock v. Dressel*, 435 F.3d 294, 299 (3rd Cir. 2006); *Linnane v. Gen. Elec. Co.*, 948 F.2d 69, 72 (1st Cir. 1991). The most salient feature of union discipline is collective action by the union as an entity through some sort of established disciplinary process. *Breininger*, 493 U.S. at 91. Unfortunately,

the facts of this case evidence that Plaintiff was the victim of *ad hoc* retaliation by Defendant Potter. Accordingly, Plaintiff has not shown that the Union took any adverse action against him and summary judgment is appropriate on his LMRDA free speech claim.

**B.    Improper Removal from Union Office**

Plaintiff also contends that Defendants had no authority to terminate him as an elected officer without following the Union's constitutional disciplinary procedures. Defendants' response to Plaintiff's claim is this: Plaintiff voluntarily terminated his employment with the Union when he abandoned his assignment in North Carolina; the Union's constitution requires Union officers to either be a member of the Union or a Union employee; by virtue of no longer being employed at the Union (and not otherwise a member of the Union), Plaintiff was no longer eligible to hold Union office; and, since Plaintiff's office was now vacant, the Union was required to fill it by an executive board vote.

Although superficially compelling, the Court cannot accept Defendants' reasoning because it still ignores the fact that Plaintiff was never afforded any of the procedural protections (*i.e.*, a disciplinary hearing) mandated by the Union's constitution. That is, Plaintiff never conceded he voluntary terminated his employment with the Union. Defendant Potter claimed that he had, and following Defendants' sequence of logic outlined above, violated the Union's constitutional requirement that its officers be members of the Union (or in Plaintiff's case, a Union member by virtue of his employment with the Union). According to the Union's constitution, any member accused of violating the Union's constitution is entitled to due process before punishment is meted out. Thus, Defendants should have afforded Plaintiff the opportunity to be heard on whether he in

fact voluntarily resigned before they can consider him ineligible for Union office. Accordingly, summary judgment on Plaintiff's removal from office claim in inappropriate.

### C. Wrongful Discharge Against Michigan Public Policy

Ordinarily, employers and employees enjoy an at-will relationship, meaning the employee can quit or be fired at any time—for any or no reason—subject to certain delimited public policy exceptions. *Suchodolski v. Mich. Consol. Gas Co.*, 316 N.W.2d 710, 711 (Mich. 1982) (citing *Toussaint v. Blue Cross & Blue Shield of Mich.,* 292 N.W.2d 880 (Mich. 1980)). In order to state a claim of wrongful discharge against Michigan public policy, Plaintiff must demonstrate that he suffered an adverse employment action because of a law he refused to violate, a duty he was obligated to discharge, or a right he was entitled to exercise. *Suchodolski*, 316 N.W.2d at 711-12.

Plaintiff's theory of wrongful discharge against Michigan public policy is that he was discharged for exercising his free speech rights under the LMRDA. However, "[a]s a general rule, the remedies provided by statute for violation of a right having no common-law counterpart are exclusive, not cumulative." *Dudewicz v. Norris-Schmid Inc.*, 503 N.W.2d 645, 649 (Mich. 1993). The Court is unaware of any common law right to be free from reprisal when commenting on matters concerning a labor organization. Therefore, the Court finds that the LMRDA provides Plaintiff's exclusive remedy for any retaliation generated by his free speech. Consequently, summary judgment is appropriate on his wrongful discharge against Michigan public policy claim.[7]

---

[7] Plaintiff also suggests that because he refused to donate to the Union's legal defense fund, he was retaliated against in violation of Michigan's Wage and Fringe Benefits Act. MICH. COMP. LAWS § 408.478. The record discloses, and Plaintiff concedes in earlier portions of his brief, that contributions to the fund were voluntary. Consequently, the policy behind the Wage and Fringe Benefits Act is not implicated here because the Act is designed to prohibit mandatory payments (*i.e.*, kickbacks) as a condition of employment.

### D.     Tortious Interference with Business Relationship

Plaintiff's remaining claim for discussion is his belief that Defendant Potter tortiously interfered with his Union office and otherwise spoiled his business relations.

> The basic elements which establish a *prima facie* tortious interference with a business relationship are [1] the existence of a valid business relation (not necessarily evidenced by an enforceable contract) or expectancy; [2] knowledge of the relationship or expectancy on the part of the interferer; [3] an intentional interference inducing or causing a breach or termination of the relationship or expectancy; [4] and resultant damage to the party whose relationship or expectancy has been disrupted. One is liable for commission of this tort who interferes with business relations of another, both existing and prospective, by inducing a third person not to enter into or continue a business relation with another or by preventing a third person from continuing a business relation with another.

*Feaheny v. Caldwell*, 437 N.W.2d 358, 362-63 (Mich. App. 1989) (citations omitted). In the context of an employer-employee relationship, for this tort to exist there must be a third-party to the relationship who intentionally does some wrongful act to undermine an existing favorable relationship between the employer and employee. *Id.* at 363 (citing *Formall Inc. v. Comty. Nat'l Bank*, 421 N.W.2d 289, 293 (Mich. App. 1988)). Defendants maintain that because Defendant Potter acted as Plaintiff's employer, he could not have been a third-party for purposes of tort liability. Upon review, the Court finds that Defendants are only partially correct.

Defendant Potter did have the ability to hire and fire Plaintiff with respect to his employment with the Union. In this regard, Plaintiff served at Defendant Potter's pleasure and Defendant Potter was not a third-party to this relationship. Summary judgment is appropriate to the extent that Plaintiff seeks damages for tortious loss of his Union employment. However, concerning Plaintiff's elected Union office, Plaintiff served as the will of Union members and could only be removed through proper disciplinary procedures which, as previously stated, were not followed. Thus,

Defendant Potter can be seen as a third-party to this relationship and summary judgment on Plaintiff's claim that Defendants tortiously interfered with his Union office is inappropriate.

## IV.   CONCLUSION

Therefore, the Court will grant in part and deny in part Defendants Robert Potter and the Union's Motion for Summary.  A Partial Judgment consistent with this Opinion shall enter.

|  |  |
|---|---|
| DATED in Kalamazoo, MI:<br>       July 17, 2006 |  /s/ Richard Alan Enslen <br>RICHARD ALAN ENSLEN<br>SENIOR UNITED STATES DISTRICT JUDGE |